**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**Civil Case No. 5:26-cv-899**

| | |
|---|---|
| CHASE M. TAYLOR,<br>Plaintiff<br>v.<br>YE aka KANYE WEST aka KANYE OMARI WEST,<br>VERY GOOD TOURING, INC.,<br>YEEZY LLC,<br>YEEZY APPAREL LLC, and<br>GETTING OUT OUR DREAMS, INC.,<br>Defendants | **COMPLAINT**<br>**(Jury Trial Demanded)** |

## INTRODUCTION

1. Opera is known for its tragedies. Stories of lost love, greed, and betrayal pervade the genre, elevated through musical excellence, stunning performance, and captivated crowds. But not all tragedies end with a curtain call. This case tells a story fit for the stage. Our characters: a talented artist manipulated by the elite, imprisoned in a fortress, and defrauded by promises of fame and fortune; an arrogant king, publicly fallen from grace, claiming redemption through religion; and a royal guard, desperate to please the king, no matter the cost.

2. The plaintiff—and the main player in this story—is Chase Taylor, a composer, music director, and renowned opera performer.

3. The arrogant king is Kanye West—the once-famous but now infamous musician who recently changed his legal name to "Ye" (which he pronounces like the accolade "Yay!"). For years, West was regarded as the king of hip-hop. He sold millions of albums, earned

hundreds of millions of dollars, and became a prominent celebrity. Starting in 2009, however, West became mired in controversy, fell in the eyes of fans and the public, reportedly lost hundreds of millions of dollars in earnings, and claimed in 2016 that he was $53 million in debt.

4. West sought to re-establish himself using religion and new creative outlets. Claiming to identify himself with King Nebuchadnezzar—a historic king who, according to the Bible, fell from grace and was redeemed through faith—West announced plans to stage an opera recounting the story of Nebuchadnezzar. This was to be the first in a series of religious operas.

5. West's plans for *Nebuchadnezzar*—carried out in coordination with his team of businesses and business associates—were built of air. While West had arranged to monetize the production, he failed to prepare the actual opera.

6. Facing a rapidly approaching performance date, West hired Taylor to sing the lead role in *Nebuchadnezzar.* But after Taylor agreed, he learned the truth: there was no opera. No music, no score, no lyrics, no plan. In their place: a barren room, a few other performers, and a directive to compose, orchestrate, and rehearse an opera from scratch, to be performed in four days. Defendants locked the door and ordered Taylor to work until the opera was done.

7. To secure Taylor's compliance, Defendants (including West) promised lucrative compensation, producer credit, and future work. They also told Taylor that the performance was not-for-profit and that the event's proceeds would be used to "save souls."

8. Based on Defendants' false promises, Taylor agreed to work first as a featured opera soloist, then as composer, orchestrator, multi-instrumentalist, music director, and producer for four religious-themed operas in November and December 2019. Each opera was produced under extreme conditions in a matter of days.

9. Defendants failed to live up to their promises. The lucrative compensation never arrived; Taylor never received the promised producer credit; there was no future work. Additionally, the operas were not non-profit productions, and the proceeds were predominantly used not to "save souls" or support a religious cause, but to line Defendants' pockets.

10. The exploitation did not end with the opera performances. As time passed, West incorporated Taylor's arrangements into West's albums and concerts, and continues to earn millions from Taylor's work, all while denying Taylor compensation and credit.

11. Taylor brings this suit to vindicate his rights as an artist, to secure ownership of his creative works, and to receive the payment he has thus far been denied.

**PARTIES**

12. Plaintiff Chase Taylor (Taylor) is a composer, music director, and renowned opera performer. Taylor has performed at many of the world's most prestigious opera houses, including the Metropolitan Opera in New York, the Lyric Opera in Chicago, and the Royal Opera House in Muscat, Oman. Taylor is known for his commanding stage presence, dynamic voice, and stentorian high notes. Taylor resides in Raleigh, North Carolina.

13. Defendant Ye, known best by his birth name Kanye West (West), is a hip hop artist known for his controversial views, large ego, and brash arrogance. West has at various times described himself as "the number one human being in music," God's chosen "voice," and the "biggest rock star on the planet." On information and belief, West resides in California.

14. Defendant Very Good Touring, Inc. (VGT) is West's concert and tour production company. On information and belief, Very Good Touring is a California corporation with its principal place of business at 20020 Parthenia Street in Northridge, California. On information and belief, Very Good Touring is owned by West and West benefits financially from its activities.

15. Defendant Getting Out Our Dreams, Inc. (GOOD Music) is West's music production company. On information and belief, GOOD Music is a California corporation with its principal place of business at 20020 Parthenia Street in Northridge, California. On information and belief, GOOD Music is owned by West and West benefits financially from its activities.

16. On information and belief, Defendant Yeezy LLC (Yeezy) is a Delaware company that handles merchandising and licensing for West and VGT and is owned by West, and West benefits financially from its activities. On information and belief, Yeezy LLC has its principal place of business at 820020 Parthenia Street in Northridge, California.

17. On information and belief, Defendant Yeezy Apparel LLC (Yeezy Apparel) is a Delaware company that handles merchandising and licensing for West and VGT and is owned by West, and West benefits financially from its activities. On information and belief, Yeezy

Apparel LLC has its principal place of business at 20020 Parthenia Street, Northridge, California 91324.

## JURISDICTION & VENUE

18. This action arises under the Copyright Act, and this Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).

19. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332, as Taylor, a resident of North Carolina, is diverse as to each of the Defendants, and the amount in controversy exceeds the sum of $75,000.

20. This Court has subject matter jurisdiction under 28 U.S.C. § 2201 to issue a declaration confirming that Taylor has authorship rights under the Copyright Act.

21. This Court has personal jurisdiction over Defendants pursuant to North Carolina's long arm statute, N.C. Gen. Stat. § 1-75.4. Defendants contacted and recruited Taylor in North Carolina, made fraudulent representations to Taylor in North Carolina, and advanced their fraudulent scheme by booking Taylor's travel to and from North Carolina. Defendants also streamed and sold unauthorized copies of Taylor's work in North Carolina, and earned profits in North Carolina from their complained-of activities that are subject to an accounting.

22. Venue is proper in this district under 28 U.S.C. § 1391 since a substantial part of the events giving rise to Taylor's claims took place in this district.

## FACTS COMMON TO ALL CAUSES OF ACTION

**PROLOGUE: The Arrogant King, His Fall from Grace, and His Plan for Redemption**

23. West has been one of the most popular hip hop artists of all time. He rose to prominence following the release of his first studio album, *The College Dropout*, in 2004. From 2004-2008, West produced four studio albums, each of which found great critical and commercial success.

24. West's ascendancy was soon followed by controversy. As time passed, he started making headlines not for his music, but for wild antics and scandal. In 2009, West became national news when he interrupted Taylor Swift on national television; in 2013, West had several high-profile confrontations with paparazzi and declared "I am a god"; in 2018, West gave an interview where he said that slavery "was a choice."

25. West recognized the need to salvage his reputation. He developed a plan to do so that involved public declarations of devotion to God.

26. On November 17, 2019, West announced that he was producing an opera based on the story of King Nebuchadnezzar. As recounted in the biblical Book of Daniel, Nebuchadnezzar was a wealthy but arrogant king who was so prideful that he was punished by God with the loss of his throne and seven years of mental illness. After Nebuchadnezzar acknowledged that God is all-powerful, both his sanity and his kingdom were restored, and he became greater than ever. West claimed that his woes were akin to Nebuchadnezzar's and suggested that public professions of faith would return his followers, fame, and wealth.

27. West announced that *Nebuchadnezzar* would be performed at the Hollywood Bowl on November 24, 2019, and that tickets would go on sale on November 18.

28. West issued a press release on November 18, 2019, describing the planned opera as "an expression of his commitment to both his faith and ever-expanding musical palette." The planned opera would indeed expand West's musical palette—West and his co-defendants had no prior experience writing, performing, or producing opera.

29. To bridge the gap, West and VGT asked John Burton to recruit premier black opera professionals to perform in the production of *Nebuchadnezzar*. At the time he was invited by West and VGT to take on this task, John Burton was a relative newcomer to the opera scene and had never produced an opera.

**ACT I, Scene 1: An Auspicious Invitation**

30. On November 19, 2019, Taylor was in Raleigh, North Carolina. On that day, Burton reached out to Taylor through a mutual acquaintance, Charles Carter. Carter relayed an important message from Burton: West was putting on an opera and was looking for an opera performer to play the lead role. Neither the title nor date of the show was disclosed but the opera was based on the story of Nebuchadnezzar. He also relayed that contract details would be worked out at rehearsals. Taylor was asked to e-mail Burton an audition tape, resume, and headshot, on a rush basis. He did so.

31. Later that day, while still in Raleigh, Taylor received a phone call from West's and GOOD Music's booking agent, Edward Roque. Roque told Taylor that he had been selected for the lead role of Daniel. Roque also told Taylor that as a condition of the engagement, Taylor would need to fly out the next day to begin rehearsals.

32. The engagement would come at significant cost to Taylor. It conflicted with a previously booked performance at the New York Metropolitan Opera and would interfere with Taylor's ability to participate in previously-scheduled auditions.

33. Taylor also recognized that time was extraordinarily tight for him to learn and perform the role. Preparing to perform in an opera is no small feat. Performers must study the libretto to understand their character and story; memorize the text (often in a foreign language); ensure their performance features the correct enunciation, diction, and accent; learn the music, which is particularly demanding and voluminous for a lead singer; learn how their role interfaces with the other performers and the overall staging and choreography; and learn entrances, exits, and costume changes. Then, performers must rehearse with the ensemble until the production is seamless. To accomplish all of this, performers typically have months to prepare. Performers need even more time for new or lesser-known works. This lead time is important since opera performers are required to execute with perfection. A single wrong note, missed entrance, or bungled lyric can destroy an opera career. For this reason, opera performers generally do not accept roles on short notice. When they do, they are compensated generously for the significant work and elevated risk.

34. Taylor accepted the role despite these risks and lost opportunities. He recognized significant upside in playing the lead role in a major West production, was excited by the substantial exposure and recognition that would follow, and believed he would be compensated generously for the risk.

35. Travel details and airline tickets followed rapidly by email. Roque sent the tickets to Taylor via e-mail late on the evening of November 19, 2019. Additional employees of Yeezy and VGT were copied on this correspondence.

36. At the crack of dawn on November 20, 2019, Taylor flew from North Carolina to Cody, Wyoming to begin rehearsals.

**ACT I, Scene 2: A New Reality**

37. When Taylor landed in Cody, West's deputy and producer, Paul Johnson, transported him to Cody High School and directed him to the high school band room. After Taylor entered the room, the doors were locked. Taylor was told he could not leave the room and that bathroom breaks would be permitted only with Johnson's approval. Taylor objected to being locked in, but Defendants ignored his objections.

38. Once inside the locked room, Taylor learned for the first time that the opera he had been engaged to perform did not exist. No opera had been written; no composer had been hired; there was no music director; and there was no production plan.

39. Taylor promptly discussed the situation with John Burton and Paul Johnson. Burton and Johnson admitted to Taylor that there was no show and that they only had a patchwork libretto.

40. Taylor was told that, in addition to serving as a lead performer and soloist, he would also need to compose the opera. Johnson also revealed that the opera needed to be completed and performance-ready in just four days, for a debut on November 24, 2019.

41. These directives—given to Taylor inside the locked and monitored room—were a complete shock. Most modern operas are written over the course of years and are workshopped, revised, and rehearsed extensively prior to premiere. Defendants sought to compress this years-long process into less than four days, with no advance notice to Taylor and woefully inadequate time to plan and prepare.

42. Taylor was not the only opera performer on the project. He recognized several colleagues from the New York opera scene, including Charles Carter, Antonio Watts, Willie Alexander III, Justin Austin, and Jasmine Muhammad. Taylor and Alexander decided to work together to compose the opera.

43. On his second day in Cody (November 21, 2019), Taylor's responsibilities expanded once again. This time, Burton told Taylor he would need to serve as the project's music director and to teach dozens of people (many of whom could not read music and had no opera experience) how to perform their roles—all in the same few days available for him to write the show and learn his own part.

44. Taylor asked Burton whom he should contact from West's team to discuss payment. Burton told Taylor that he (Burton) was responsible for payment logistics and could speak on behalf of West. Burton told Taylor that Taylor could name his own fee, as West sought a top-tier performer who, like Taylor, had performed at the Metropolitan Opera in New York. Johnson separately confirmed the same, stating that West was a billionaire who earned over $8.6 million in merchandise sales at each performance and would "be good for" any amounts owed.

45. Burton, however, also told Taylor that he should temper his monetary demands since West did not intend to profit from the opera, the performance was for charity, and any proceeds would be used "for the edification of the Kingdom" and "to save souls." Burton told Taylor to set his rates the same way he would if invoicing a church, and that a request for standard rates would be inappropriate.

46. West personally confirmed the opera was a religious, nonprofit production. West consistently referenced his religious beliefs, framed the opera as an act of piety for God, and talked about Taylor's and the other musicians' work as being for the benefit of the Lord. For example, West stated that the opera was "God's will," that "God has his hands on this," and that "God has been waiting on us."

47. Burton, Johnson, West, and West's companies (including VGT and GOOD Music) knew that the production of *Nebuchadnezzar* was not a non-profit endeavor and that West and his affiliated co-defendants would all profit from the performance. Their representations to the contrary were made with actual knowledge of their falsity or with such reckless indifference as to amount to knowledge of their falsity, and with the intent that Taylor rely upon those representations and submit lower bills for his services.

48. Burton offered further inducements to persuade Taylor to perform as requested and to bill at a reduced rate. Burton told Taylor that West planned to produce an opera for each book of the Bible, and that a lower rate of compensation would help Taylor secure future work with West and West's companies. Burton stated that West would not hire Taylor for future projects if Taylor sought compensation at his normal rates, but if Taylor billed at a reduced rate, he would be hired for a similar leading role in each of the future operas.

49. Relying on Burton, Johnson, and West's assurances regarding compensation, the purported religious and non-profit nature of the production, and the promise of future work, and further pressured by his non-consensual confinement, Taylor orally agreed to proceed with the engagement and to push forward with the monumental services he had been asked to undertake on a nearly-impossible time frame.

50. Taylor did not sign a performance contract or any other contract. He did not, then or later, agree to surrender any rights in any aspect of the productions. He did not, then or later, agree to surrender any rights in the creative works.

**ACT II, Scene 1: Work Starts in Cody**

51. Work commenced and proceeded under unprofessional conditions and for long hours each day.

52. Cody High School was not equipped to support professional music productions. The rehearsal space was a typical high school band room, complete with white walls, mid-grade instruments, too-small plastic chairs, and fluorescent lighting.

53. The band room did not have sufficient capacity to support the musicians involved in the production. Because the room did not include space to rest, musicians sat and slept on the floor when they needed a break. Defendants also did not provide enough food to feed the 150+ performers involved in the production.

54. Taylor objected to the abusive conditions and asked Defendants (through Johnson) to unlock the band room doors, provide sufficient food and water, and provide appropriate time off for the musicians to sleep. Defendants ignored these requests.

55. Taylor worked nearly around the clock, with little sleep, switching between composing, arranging, teaching, rehearsing, and revising the various parts of the show.

56. West did not meaningfully participate in the creative process. Although he had not provided sufficient food or resting space for the musicians, he arranged to have personal massages in the band room and stayed only for the duration of those massages. He also hosted meet and greets with locals and press while in the rehearsal space. Kanye's "creative contributions" consisted of occasional vague platitudes ("I like the way this is going, and I like the style of instruments") or cryptic non-directions ("Do everything like 12000 Acres").

57. While West did not offer much in the way of creative authorship, he consistently recognized and praised the quality and significance of Taylor's work, noting that Taylor perfectly captured West's essence and that Taylor's sound was "Harold's Chicken" (a reference to West's favorite chicken restaurant in Chicago). West was so impressed with the sound Taylor was able to create on Cody High School's archaic Casio keyboard that he referred to Taylor as a "music genius" and gave Taylor a nickname of "Leonardo di Casio"—evoking positive comparisons to famed actor Leonardo DiCaprio.

58. Work continued at Cody High School from November 20 to November 22, 2019. In that time, Taylor served as an opera jack-of-all-trades. He composed the opera, divided parts across different voices and instruments, ran rehearsals, helped musicians learn their parts, managed the ensemble, and workshopped the opera with Sunday Service Choir (a gospel vocal group founded by West and cast as the chorus).

59. Throughout this time, and at all times while working on productions for Defendants, Taylor served as a vital bridge connecting the opera performers, instrumentalists, and choir. Taylor was the only member of the production team with the background and experience to communicate across those disparate groups.

60. While in Cody, Wyoming, Taylor authored or co-authored several works for use in *Nebuchadnezzar*, including the opera composition, instrumentation, and orchestration for the following works:

- Our King
- Say You Will
- Eternal Life
- Eternal Rest (Requiem Aeternam)
- Mo Bamba
- Wash Us in the Blood
- 12000 Acres
- Infinity Song
- Fighting Fires
- Total Praise
- Future Sounds
- Heard 'Em Say/Praise and Honor

61. Taylor's contributions were substantial and comprised many or all of the core elements in each of the works, including bass lines, rhythms, melodies, lyrics, and vocal lines.

62. In addition to his contributions to the individual works, Taylor contributed to the opera as a whole, including by (a) selecting, arranging, and ordering the opera's constituent works, (b) providing stylistic, rhythmic, and instrumental throughlines that extended across each of the individual works to create a level of cohesion across the opera, and (c) creating the opera's narrative, musical, and lyrical themes. As a result of his creative

authorship, Taylor is an owner of copyrights in the compositions for each of the above works, the orchestration and arrangements of each of the above works, and the opera as a whole.

63. West did not meaningfully contribute to the above works as they were used in *Nebuchadnezzar*. Some of the works were lawfully derived from songs created earlier for other purposes, but the original versions of those songs were not suitable for *Nebuchadnezzar.* West did not create the new versions. West did not write music for the opera; did not choose the key, tempo, or time signature; did not write lyrics; and did not prepare the orchestrations.

64. West did not exercise meaningful control over Taylor's creative decisions. Instead, West deferred to Taylor and Taylor's colleagues, given their prior opera experience. West expressly acknowledged that "You guys are the composers, I just know not to f-ck it up," and advised other members of the production team that Taylor and his colleagues "know what they are doing. Let them lead."

**Act II, Scene 2: Work Moves to Los Angeles**

65. On November 22, 2019, Defendants transported Taylor to Los Angeles, California.

66. Taylor continued to write and rehearse throughout the day, from around 7:00 AM on November 22 until around 3:00 AM the following day. Writing and rehearsing mid-transit proved especially difficult: Taylor lacked a stable writing surface; the performers were exhausted, anxious, and operating on insufficient sleep; some members of the ensemble suffered from motion sickness; space was limited; instruments were inaccessible while traveling; and Defendants did not provide adequate food.

67. West had more surprises in store. On November 23, with the show less than a day away, West fired half of the dancers (saying there were too many white people), demanded substantial rewrites with little or no instruction, and asked Taylor to write synthesizer parts for each of the songs in the show.

68. Defendants also informed Taylor that he would no longer play the role of Daniel, but would instead play the role of narrator. This soon changed again when West decided to take the narrator role for himself and switched Taylor to an unnamed "featured soloist."

69. Taylor also learned that, in addition to singing during the show, he would be required to play piano and synthesizer. At one point, Defendants told Taylor he would be the *only* instrumentalist in the production. Taylor's role continued to change until the performance itself.

70. Taylor did not welcome these changes. The demotion from lead singer to unnamed "featured soloist" with a different vocal part was in complete derogation of the engagement he had originally accepted. The risk posed by singing an opera on short notice was already extraordinary; changing the role not only diminished his prominence but also left him with a new part to learn on even shorter notice. Adding multiple instruments on top—with instrumental parts that had yet to be written and with only a day's notice—was still worse. Like opera singers, instrumentalists must perform to perfection and require considerable time to practice and prepare. Singing and performing at the same time requires even more skill and adds additional risk. The new instrumental roles Taylor had been asked to assume were especially significant, since the piano and synthesizer set a

rhythm that controls the pace of the entire ensemble. A single error or mistake could cause the entire show to collapse.

71. Despite his misgivings, Taylor was buoyed by Defendants' assurances that Taylor would have extensive opportunities for future work—including an opera for each book of the Bible—and that Defendants would pay top-dollar for Taylor's top-tier talent. West, Johnson, and Burton repeated these promises and, for good measure, sweetened the pot with the additional promise of producer credit and permanent employment as a member of West's team. Relying on these promises, Taylor continued his work.

72. That same day, Taylor's responsibilities expanded once again when Taylor created artwork and illustrations that were used in the event program.

73. Due to his responsibilities as music director and composer, Taylor was unable to practice his individual roles until 2:00 or 3:00 AM on November 24 (the day of the show). He rehearsed through the night and slept for only a handful of hours before it was time to travel yet again.

74. On the morning of November 24, Taylor and the other performers traveled to the Hollywood Bowl and rehearsed with the ensemble from 8:30 AM until just before the scheduled 4:00 PM show time. The rehearsals, however, were incomplete. There was never a complete run-through of the entire show. In addition to rehearsing, Taylor had to continue translating lyrics for the ensemble until just before the performance began.

**ACT III: Show Time**

75. Unsurprisingly, the scheduled 4:00 PM show time for *Nebuchadnezzar* came and went. While the audience sat and waited, time dragged on for hours as behind-the-scenes chaos continued. The show ultimately started over two hours late. The performance was recorded with both audio and video.

76. Reviews told a tale of two operas. Critics and the audience marveled at Taylor's compositions, the operatic performance, and the clever melding of hip-hop and opera. The same critics lampooned West's performance and criticized the production as rushed, slapped-together, and unprofessional. For example, *Rolling Stone* noted that "the musical portions ... were competent and occasionally excellent," but observed that West's performance was "muddled" and that "West's line readings did not seem fully rehearsed: He sounded like an actor who was nearly, but not quite off-book, suggesting the proper emotional intonations as often as he truly tried to sell them." *The Guardian*'s review was similarly split: it praised Taylor's "[g]orgeous musical passages" and the "full-on, high drama, choral and orchestral power," but ultimately provided a 2-star review (out of 5) due to West's "halting narration, the imponderable plot ... and the sneaking suspicion that you were watching something that wasn't actually finished." In an especially colorful passage, *The Guardian* concluded that "at least one person watching at home on Tidal would have willingly chucked himself [into a fiery furnace], considering immolation a merciful release from West's reading and [Sheck] Wes's bellowing." As another example, a review from the *He Tells Stories Blog* complained that "Kanye's poor delivery" was "unbearable," "uninspired[,] and dry[,] like the student who reluctantly reads to the class because the teacher picked them, rather than volunteering." That same review praised the "beauty" and "emotional texture" of Taylor's compositions and instrumentation.

77. The reviewers who so admired Taylor's work did not see any attribution to him or other acknowledgment of his multiple roles.

78. Reviews aside, *Nebuchadnezzar* was a financial success that benefited Defendants, earning millions in ticket sales, merchandise, and streaming revenue.

79. That streaming revenue represented yet another surprise to Taylor. Until the evening of the show, Taylor had been told that *Nebuchadnezzar* would be a live performance, viewed by a live audience. Shortly before the show was set to start, West informed Taylor that the show would be recorded and livestreamed on major streaming platform Tidal as part of a $4 million contract. Defendants claimed that the broadcast would be a one-time streaming event and would be retained for archival purposes only. That was a lie. The performance *was* made available to the public, remained available on Tidal for seven months, and on information and belief has received millions of views. On information and belief, the Tidal livestream was copied by others, and remains available in whole or part for viewing. Taylor never authorized Defendants to use his voice or image or to authorize others to use his voice or image in this manner. Taylor was never provided any part of the livestream proceeds.

**Act IV, Scene 1: Lather, Rinse, Repeat (*Mary I*)**

80. Following the Hollywood Bowl performance of *Nebuchadnezzar*, Taylor flew back home to North Carolina. A week later, Defendants—again through Burton—contacted Taylor in North Carolina and discussed plans for additional opera productions with West. Taylor had not yet been paid for his work on *Nebuchadnezzar*, but was told that he would be paid if he continued to cooperate with Defendants. Talyor believed that his best chance at

receiving payment was to participate in additional projects. He also believed that the new project comprised part of the additional work Defendants had previously promised, and that the new show would lead to steady, reliable, and ongoing compensation. Taylor agreed to participate. Roque followed up with travel plans.

81. On December 3, 2019, Taylor flew from Raleigh, North Carolina to Los Angeles, California. Once again, the opera he was hired to perform did not exist. Defendants wanted Taylor to take on the same responsibilities as he had in *Nebuchadnezzar*: to serve as a featured soloist, composer, music director, ensemble coach, and multi-instrumentalist. This time, the opera would recount the story of Mary.

82. Defendants informed Taylor that the opera was scheduled to premiere in just five days, in Miami's Marine Stadium at the renowned Art Basel show, on December 8. As with *Nebuchadnezzar*, Taylor was told he could name his price and was promised future work and a producer credit.

83. The timing and creative process for *Mary* were similar to those for *Nebuchadnezzar*. *Mary* was written in less than five days, in extreme conditions. From December 4 until December 7, 2019, Taylor and his colleagues worked nearly around the clock to write the opera, teach music to the Sunday Service Choir and other performers, and rehearse. As before, food and sleep were limited.

84. Taylor's colleagues included Nikki Greer, Willie Alexander III, Justin Austin, and Faune Watkins. Together, the group selected a handful of classic Christmas standards and songs from West's previous albums that could be ordered and adapted to tell the story of Mary and the nativity.

85. Taylor set the percussion instrumentation across the entire show; adapted hip-hop rhythms, instruments, and styles to an opera setting; and, as with *Nebuchadnezzar*, created a musical throughline that tied the opera together as a cohesive whole, including through the use of recurring bass lines and synth arrangements.

86. As with *Nebuchadnezzar*, West's involvement in the creation of *Mary* was limited. West approved the group's selection of songs to be included in the opera and attended two or three short listening sessions (each lasted 5-10 minutes) where he confirmed that he liked the sound of the various arrangements. Closer to the show, West sat in on a longer rehearsal, but by that point, the music was already written.

87. West did not exercise meaningful control over Taylor's creative decisions relating to *Mary* beyond approving the song selection. Instead, West deferred to Taylor and Taylor's colleagues, given their prior opera experience.

88. In connection with the initial production of *Mary*, Taylor authored or co-authored the opera composition, instrumentation, and orchestration for the following works:

- Mary Mary
- Gabriel's Message
- Gabriel's Aria
- Fecit Magnalia
- Devil In A New Dress
- Can't Tell Me Nothin
- Can't Tell Me Nothin (Alternate Version)
- Love Lockdown
- Love Lockdown (Alternate Version)
- Holy Terrain
- I Thought About Killing You
- Power

- Power (Alternate Version)
- Selah
- Ave Maria
- Gloria (Angels We Have Heard) (Unused version)
- Little Drummer Boy (Unused version)
- O Holy Night (Unused version)

89. Taylor's contributions were substantial and comprised many or all of the core elements in each of the works, including bass lines, rhythms, melodies, lyrics, and vocal lines. Taylor also incorporated innovative mash-ups, callbacks, and references to classical opera works.

90. In addition to his contributions to the individual works, Taylor contributed to the opera as a whole, including by (a) selecting, arranging, and ordering the opera's constituent works, (b) providing stylistic, rhythmic, and instrumental throughlines that extended across each of the individual works to create a level of cohesion across the opera, and (c) creating the opera's narrative, musical, and lyrical themes. Thus, Taylor is an owner of copyrights in the compositions for each of the above works, the orchestration and arrangements of each of the above works, and in the opera as a whole.

91. West did not meaningfully contribute to the above works as they were used in *Mary*. Some of the above works were lawfully derived from songs created earlier for other purposes, but the original versions of those songs were not suitable for *Mary.* West did not create the new versions. West did not write music for the opera; did not choose the key, tempo, or time signature; did not write lyrics; and did not prepare the orchestrations.

92. On the evening of December 7, 2019, Taylor flew overnight from Los Angeles to Miami. When he arrived on December 8, he rehearsed with the ensemble from early in the

morning until the time of the performance. As with *Nebuchadnezzar,* the ensemble was never able to rehearse the show from start to finish.

93. The performance started over an hour late. It was recorded with both audio and video.

94. Taylor played an essential role in the *Mary* performance. He was a featured soloist and double-instrumentalist, and his music provided the opera's stylistic core.

95. The critical reception of *Mary* mirrored that of *Nebuchadnezzar*: Critics and attendees loved Taylor's music and operatic performance, but chided West's haphazard, slapdash, and last-minute production antics. Billboard praised Taylor's "glorious choral arrangement," but complained that West sounded like "a nervous child reading aloud in class, sometimes stumbling on his words or transitions." While Billboard enjoyed "the forceful booms of the massive choir," the music was tainted by what it described as "the definition of a last-minute event."

96. On information and belief, Defendants earned substantial profits from the *Mary* performance, including through sale of tickets and merchandise.

97. Defendants flew Taylor back to North Carolina following the performance.

**Act IV, Scene 2: Lather, Rinse, Repeat (*Mary II*)**

98. When the first performance of *Mary* proved successful, Defendants decided to offer another performance—this time, at Laskey Mesa in Calabasas, California, scheduled to take place on December 15, 2019 ("*Mary II*").

99. On December 10, 2019, Taylor sought clarification and details about the upcoming performance via a call and texts with Burton. Taylor also asked about payment for the prior performances, which had yet to be delivered. Burton asked Taylor to perform his *Mary* role again. Taylor agreed, and Defendants flew him back to California that same day.

100. Taylor's arrival was followed by an increasingly familiar series of missteps, misrepresentations, and added responsibilities. Instead of simply repeating his prior operatic performance, Taylor was called upon to make substantial revisions to the production, in just four days. Once again, Taylor served as composer, lyricist, arranger, music director, featured soloist, and instrumentalist. Once again, Taylor worked around the clock, with just a few hours of sleep each day. And once again, Taylor was promised substantial compensation and producer credits.

101. Taylor's revisions were extensive. Taylor revised his previous arrangements by adding additional voices, melodies, counterpoints, and arpeggiations, and by adding more detailed chordal structures to the arrangements. Taylor is an owner of copyrights in the compositions for each of the works as revised for *Mary II*, the orchestration and arrangements for those works, and in the revised *Mary II* opera as a whole.

102. Defendants—including West—did not meaningfully contribute to the rewrite and revision process. West simply provided vague, high-level comments, such as "make it bigger," or "you all are having too much fun. More serious."

103. The performance proceeded as scheduled on December 15, 2019, and was a success. Attendees included Steph Curry, Kobe Bryant, and Dr. Dre. The performance was recorded with both audio and video.

104. On information and belief, Defendants earned substantial profits from the *Mary II* performance, including through sale of tickets and merchandise.

**Act IV, Scene 3: Lather, Rinse, Repeat…Repeat (*Mary III*)**

105. When *Mary II* proved successful, Defendants resolved to produce a third performance. But Defendants did not know when or where the next show would take place, other than that they wanted to put on the show as soon as possible.

106. In anticipation of the next production, Defendants asked Taylor to remain available to them, on "reserve." Defendants—through John Burton and Derek Watkins—asked Taylor not to book any new performances and asked him to stay in California so he would be available for the next engagement. In exchange, they promised ongoing work that would be more valuable than the work Taylor was already missing. This included a planned series of operas covering other books of the Bible over the next 4 years. Taylor agreed, and spent December 16 and 17, 2019 in Los Angeles, revising the orchestrations from *Mary II* and practicing his parts.

107. On December 18th, 2019, Defendants flew Taylor to New York City to prepare for the next performance of *Mary* ("*Mary III*"), which was to take place on December 22, 2019, at the Lincoln Center.

108. From December 19 through December 22, 2019, Taylor worked around the clock to revise, reorchestrate, teach, music direct, and rehearse *Mary III*. Taylor also revised lyrics, added new vocal lines, transposed some of the pieces, wrote additional choral parts for women, and adjusted the scoring to better accommodate the acoustics of the Lincoln Center. These revisions were substantial, and once again cut across the entire opera.

109. Taylor is an owner of copyrights for the compositions in each of the revised works, the orchestration and arrangements of those works, and in the *Mary III* opera as a whole.

110. Once again, Defendants (including West) did not meaningfully participate in these revisions, and West did not attend rehearsals.

111. The final performance of *Mary,* in the form of *Mary III*, took place at the Lincoln Center on December 22, 2019. Like the other performances, it started over an hour late. Taylor once again played the synthesizer and piano and was a featured opera soloist. The performance was recorded with both audio and video.

112. Reviewers once again enjoyed Taylor's musical arrangements and opera performance, but disliked the production value and West's antics. One reviewer observed that "[i]t sounded like [Kanye West] [had] never seen the words before at all. He stumbled over them, mispronouncing several including the word 'Israel.'" In contrast, the reviewer praised the music: "Most of the music–none of which Kanye wrote–was provided by a very large, enthusiastic choir. They actually provided a lovely harmonic background to the proceedings." Billboard similarly praised the music, observing that the show's "synchronized riffs and perfectly-timed cutoffs caused the audience to erupt into

spontaneous cheers and applause." Billboard also remarked on the show's "snafus," including, once again, an hour-long delay in starting.

113. On information and belief, Defendants earned substantial profits from the *Mary III* performance, including through sale of tickets and merchandise.

**Act V: Promises Made; Promises Broken**

114. In just one month Taylor wrote, rehearsed, and performed two operas from start to finish, then substantially modified, rehearsed, and performed the second opera two more times. This process was a whirlwind that did not provide time for Taylor to take stock of the work he had done or the promises that were unfulfilled.

115. Indeed, the schedule was so uncertain that Taylor did not know where he would be from one day to the next, did not know if there would be another show, whether he would be booked for that show, or when and where any subsequent performance would take place. For example, Taylor was surprised when he packed for 60+ degree weather in Los Angeles, California, only to find himself (at Defendants' request) in New York City with no jacket and in sub-freezing temperatures.

116. Once the dust settled, Taylor saw that Defendants failed to live up to their promises.

117. Defendants initially told Taylor he was hired to perform in a new, fully composed opera. This was a lie. Defendants knew there was no opera and that the show was yet to be written.

118. Defendants told Taylor that they would provide a contract for the first opera when Taylor arrived in Wyoming. No contract was ever provided.

119. Defendants told Taylor that he would play the lead role of Daniel in *Nebuchadnezzar*. That never happened.

120. Defendants repeatedly told Taylor that the operas were non-profit engagements performed for religious purposes. That was a lie. West and his co-defendant companies charged attendees for tickets, and, on information and belief, pocketed the profits.

121. Defendants repeatedly promised Taylor a producer credit for his work. That never happened. Defendants did not give Taylor a producer credit, nor did they provide any public acknowledgement of Taylor's work as composer, orchestrator, or music director—or for any of the other work he performed.

122. Defendants repeatedly promised Taylor future work, stated that West would add Taylor to West's permanent creative team, and that Taylor would receive regular income that would be life-changing. That never happened. There was no work after *Mary III*.

123. Defendants repeatedly told Taylor they would pay top-dollar for his work. That was a lie. Defendants did not pay Taylor top-dollar for his work and were not even willing to pay bottom-dollar. Taylor invoiced Defendants for some of his work. In setting his rate, Taylor accounted for Defendants' representations that the projects were non-profit affairs put on for religious purposes, and their warning that Taylor would not be hired again if he sought normal market rates for these nonprofit religious productions. Thus, Taylor invoiced his work at substantially less than market rates. Defendants refused to pay even the invoiced amount. Any offer by Taylor to accept a lower rate is withdrawn.

124. Throughout the productions, Defendants—through their agents—told Taylor that payment would come in the future. The excuses varied—they would pay once the box office cleared; once the finance department approved the budget; once the chaos of the shows calmed down; and so on. While the specifics changed, the overall message stayed the same—keep working; the payments will come later; Kanye has millions, this is no sweat; be a team player; don't worry. It was only after the work was done and the shows were complete that Defendants definitively refused to pay.

**Act VI: Theft Is The Greatest Flattery**

125. In the years that followed, Defendants West, Yeezy, and VGT copied Taylor's compositions and orchestrations, incorporated them into new performances and musical works, and used them in derivative works. Defendants did not obtain Taylor's permission, nor did they provide Taylor with any credit, attribution, payment, or share of any profits or proceeds.

126. The following chart identifies instances in which West, Yeezy, and VGT used Taylor's work without permission or compensation.

| **Title of Taylor's Work** | **Title of Defendants' Unauthorized/Uncompensated Use** | **Approximate Date of Defendants' First Use** |
|---|---|---|
| Eternal Life | Eternal Life | April 2020 |
| 12000 Acres | 12000 Acres | 5/1/2020 |
| Wash Us in the Blood | Wash Us In the Blood | 6/30/2020 |
| Eternal Rest | Requiem Aeternam (from West's album *Emmanuel*) | 12/25/2020 |
| Devil In a New Dress | Hurricane ft. The Weeknd and Lil Baby | 9/14/2021 |
| Future Sounds | Sounds ft. Juice WRLD and Travis Scott | 2/4/2022 |
| Our King | Our King | 11/18/2022 |

| Title of Taylor's Work | Title of Defendants' Unauthorized/Uncompensated Use | Approximate Date of Defendants' First Use |
|---|---|---|
| Our King | Nebuchadnezzar's Dream | March 2023 |
| Future Sounds | Telekinesis ft. Travis Scott, Future, SZA and Ye | 7/28/2023 |
| Devil In a New Dress | Slide ft. Y$, Ye, Ty Dolla $ign | 8/2/2024 |
| Devil In a New Dress | Promotion | 8/2/2024 |
| Devil In a New Dress | Bomb ft. Y$, North West, Chicago West, Yuno Miles | 8/2/2024 |
| Devil In a New Dress | Forever Rolling | 8/2/2024 |
| Fighting Fires | My Soul | 8/3/2024 |

In addition to the above, Defendants performed or incorporated Taylor's work into numerous Sunday Service Choir concerts and performances.

127. Defendants' use of Taylor's work was not incidental or trivial. Several of Taylor's works were copied with little or no meaningful changes from the opera arrangements. Where copying was not complete, Defendants nevertheless took significant and distinctive elements from the copied works and featured them prominently.

128. Defendants' songs were purchased, streamed, and downloaded millions of times, and, on information and belief, were performed live for tens of thousands of people. On information and belief, Defendants earned millions from their use of Taylor's works and obtained substantial notoriety.

129. Defendants did not share any of those profits with Taylor. This is unlawful. As an author or co-author of the underlying works, Taylor is entitled to a share of all profits generated from their use.

130. In 2020, Taylor executed an agreement with Defendants that tolled all time-based defenses relating to the claims at issue in this complaint, including defenses based on statutes of limitations. The tolling agreement remains in effect.

## COUNT I
## Declaratory Judgment of Copyright Ownership

131. Taylor incorporates and realleges the foregoing paragraphs of this Complaint.

132. Taylor is an author of the compositions, orchestrations, and performances for each of the works identified in ¶¶ 60 and 88. Taylor also authored *Nebuchadnezzar* and three iterations of *Mary*, as alleged in ¶¶ 62, 90, 101, 108, and 109 (collectively with the works identified in ¶¶ 60 and 88, "Taylor Works"). Taylor provided substantial creative contributions to each of those works and is thus an author of those works under 17 U.S.C. § 201.

133. Defendants dispute that Taylor is an author of the Taylor Works and that Taylor has an ownership interest in the Taylor Works. Thus, the parties have an actual controversy relating to the authorship and ownership of the Taylor Works.

134. Taylor was not an employee for hire of any of the Defendants.

a. Taylor did not sign an employment agreement;

b. Taylor did not receive any employee benefits such as healthcare, vacation time, or 401(k) contributions;

c. Taylor was not treated as an employee for tax purposes. *See Kirk v. Harter*, 188 F.3d 1005, 1008 (8th Cir. 1999) ("[E]very case since *Reid* that has applied the test has

found the hired party to be an independent contractor where the hiring party failed to extend benefits or pay social security taxes.”).

d. Defendants did not exercise meaningful control over the creative process or creative output for any of the Taylor Works.

e. The act of composing and orchestrating an opera is skill-intensive and requires use of training and specialized expertise.

f. The standard practice in the opera industry is to retain performers, composers, and orchestrators who are independent contractors, retained on a by-project basis. Defendants did not depart from these norms.

g. Taylor’s relationship with Defendants was not regular or recurring, but was limited in time; from start to finish, Taylor’s engagement lasted a month;

h. Defendants did not have the right to assign Taylor new or different projects. Each engagement was separately agreed to and required additional compensation.

i. Opera productions were not and are not within Defendants’ regular line of business.

135. There was no agreement between the parties—written or otherwise—that the Taylor Works would be or were created as a work for hire.

136. Taylor never transferred or assigned his rights in the Taylor Works to anyone else.

137. Taylor is entitled to a declaration from this Court confirming that Taylor is an author of each of the Taylor Works.

**COUNT II**
**Accounting**

138. Taylor incorporates and realleges the foregoing paragraphs of this Complaint.

139. As an author of the Taylor Works, Taylor is entitled to a share of all profits derived from Defendants' use or licensing of those works.

140. On information and belief, Defendants include co-authors and/or co-owners of one or more Taylor Works.

141. Joint authors of a work are required to share any profits earned from their use of the work with each other co-owner, on an equal basis.

142. As described above, Defendants have made extensive use of the Taylor Works. On information and belief, Defendants obtained profits amounting to millions of dollars from their use and exploitation of the Taylor Works. Taylor is entitled to an accounting to determine the specific amount of profits attributable to Defendants' use of those works, and his share thereof.

143. Each of the Defendants profited from the Taylor Works, and Taylor is entitled to an accounting as to each of the Defendants. Defendant West used and profited from the Taylor Works in connection with his performances and album releases. Defendant VGT used and profited from the Taylor Works by producing, organizing, and promoting concerts and performances featuring those works; Defendant GOOD Music used and

profited from the Taylor Works by producing, selling, and promoting albums, music tracks, and music videos featuring the Taylor Works. Defendant Yeezy used and profited from the Taylor Works by creating, selling, promoting, and licensing merchandise and other products related to the Taylor Works and to performances featuring the Taylor Works. Defendant Yeezy Apparel used and profited from the Taylor Works by creating, selling, promoting, and licensing apparel related to the Taylor Works and to performances featuring the Taylor Works.

144. None of the Defendants has provided a full, accurate, and verifiable accounting to Taylor at any time, and Taylor has no way to access a full, accurate, and verifiable accounting, except from the Defendants.

145. The remedies available at law are insufficient since Taylor lacks information regarding all of the ways in which Defendants used the Taylor Works and lacks information regarding the profits that flowed from that use.

## COUNT III
## False Imprisonment

146. Taylor incorporates and realleges the foregoing paragraphs of this Complaint.

147. Defendants West, VGT, and GOOD Music imprisoned Taylor by locking him in the Cody High School band room and posting guards at all exits. The exits were guarded or controlled by John Burton, Derek Watkins, and Paul Johnson, each of whom acted on behalf or under the direction of West and one or both of VGT and GOOD Music.

148. During the confinement, these Defendants did not allow Taylor to leave for meals and did not provide adequate food. Taylor—who was then a 38-year-old man—was not even

permitted to use the restroom without the express permission of these Defendants during this time.

149. Taylor asked Defendants to remove the restrictions, as described in ¶¶ 37 and 54. Defendants did not comply with his requests during the initial period of confinement.

150. Defendants' detention and confinement of Taylor was intentional. There was no legal justification for the confinement. Taylor did not consent, nor was he informed of the restrictions in advance.

**COUNT IV**
**Promissory Estoppel**

151. Taylor incorporates and realleges the foregoing paragraphs of this Complaint.

152. Defendants West, VGT, and GOOD Music, acting personally and through their agents, promised Taylor that if he performed in West's opera project he would be richly compensated and would be able to name his price. These Defendants also told Taylor that they intended to stage dozens of operas with several performances each, and that Taylor would have a steady flow of future paid work.

153. These Defendants asked Taylor to clear his schedule to ensure he was available to rehearse and perform in West's opera.

154. These Defendants assured Taylor that he would receive a producer credit.

155. These Defendants did not follow through on their promises.

156. Taylor reasonably relied on these representations to his detriment.

157. Within the opera industry, auditions for the upcoming season are typically scheduled during the period from November to February. During these months, professionals like Taylor audition to secure performance contracts for the year. These months are critical for performers as the resulting engagements constitute a substantial portion of their annual income.

158. By prioritizing Defendants' engagements, Taylor lost the opportunity to pursue significant auditions and paid work for the 2020 opera season. Among other losses, Taylor skipped four previously-scheduled auditions with major operas in Seattle, Santa Fe, Los Angeles, and Houston, each of which was likely to result in paid engagements. He also was precluded from participating in several "walk-in" auditions and opportunities that were likely to result in paid engagements during the 2020 opera season. Taylor forwent those opportunities and resulting paid engagements so that he could play the promised lead role and receive promised compensation and credits in West's productions.

159. Based on Taylor's qualifications and experience, if Taylor had participated in these auditions, he would have booked performances throughout 2020.

160. Taylor's reliance on Defendants' promises was intended and foreseeable, as Defendants asked Taylor to commit to work for them over an extended period during these key audition periods, and ultimately asked him to clear his schedule so that he would be available exclusively to them.

161. Defendants did not honor their commitments; they did not allow Taylor to name his price, did not honor Taylor's invoices, did not follow through on their commitment to

provide Taylor with a steady flow of paid work, and did not provide Taylor with a producer credit or any other credit for his work.

162. Taylor is entitled to compensation in an amount sufficient to account for the engagements he lost based on Defendants' false promises.

## COUNT V
## Unjust Enrichment

163. Taylor incorporates and realleges the foregoing paragraphs of this Complaint.

164. Taylor provided substantial and valuable contributions to Defendants' productions. For each of four operas, Taylor took on responsibilities of composer, orchestrator, music director, featured soloist, and multi-instrumentalist. Taylor also assisted with lighting, stage managing, staffing, directing, choreography, and program design. Without Taylor's contributions, the operas could not have gone forward.

165. The value of Taylor's contributions is magnified by the fact that each of the four operas was fully produced (from conception to performance) in just a few days. Original operas normally take *years* to produce. The unprecedented nature of the productions confirms the tremendous value of Taylor's work.

166. The value of Taylor's contributions is further heightened in view of the terrible conditions under which Taylor operated. Taylor worked around the clock, in a confined space, with old and insufficient instruments. Taylor was also tasked with teaching other performers—who themselves were operating on little or no sleep and who were generally unable to practice individually—how to perform their parts.

167. Taylor's contributions required years of education and professional experience. Taylor was uniquely suited for this role, since he had experience performing opera, performing as an instrumentalist in various musical styles, and teaching music to individuals and ensembles.

168. Given Taylor's unique credentials and experience, it likely would not have been possible to replace Taylor. Even if it were possible, Defendants would have needed to hire at least three professionals to perform all of Taylor's roles and would have needed to pay a hefty price to do so. Given Defendants' tight time frame, that was not an option, even if theoretically possible.

169. Defendants took advantage of Taylor's contributions and actively solicited them in advance of each opera. Defendants also recognized the value and significance of Taylor's contributions. West referred to Taylor as a "music genius." Vanessa Beecroft, who directed each opera on behalf of West and West's companies, including on information and belief VGT and GOOD Music, acknowledged that the operas would not have been possible without Taylor's contributions. Paul Johnson cited Taylor's work as the most interesting part of the *Mary* productions.

170. Defendants profited millions of dollars from Taylor's work in the form of ticket sales, a $4 million Tidal contract, valuable media coverage, and merchandise sales associated with each of the four opera performances. Defendants earned millions more by using Taylor's work in several of Kanye's later-issued songs, as detailed in ¶¶ 125-129. These uses earned additional profits through additional ticket sales, album sales, streams and downloads, and merchandising.

171. Taylor provided his services with the understanding that he would be paid for his time and for the value of his contributions. Defendants directly and through their affiliates and agents repeatedly confirmed that Taylor would be paid, that they were willing to pay top dollar for Taylor's work, and that price was not an issue. Defendants used Taylor's work for their benefit and profit, but did not compensate Taylor for the fair value of his work.

172. Over the course of the four productions, Taylor spent over 600 hours working on the shows; played thousands of notes on synth and piano; prepared dozens of distinct musical works; performed as a featured soloist four times for a collective live audience of over 24,000 people (not including subsequent listens on Tidal); and travelled over 14,000 miles. While producing the shows, Taylor went without adequate food and sleep in order to meet Defendants' needs and requests for his services. Taylor also created a synth patch that Defendants continue to use, but for which Defendants have not provided any compensation.

173. Taylor is entitled to fair compensation commensurate with the value of his work. Defendants have not provided that compensation.

**COUNT VI**
**Fraud**

174. Taylor incorporates and realleges the foregoing paragraphs of this Complaint.

175. Defendants defrauded Taylor. In addition to the details of Defendants' fraud set out above, the following chart summarizes specific fraudulent statements with precision. For each individual identified as the maker of a false statement, any additional persons on

whose behalf they made the listed false statements are identified the first time that individual's name is set out.

| False Statement | Who Made the False Statement | When | Where |
|---|---|---|---|
| West's team had a fully written, performance-ready opera | John Burton, on behalf of West and West's companies, including on information and belief VGT and GOOD Music (Burton's statement was relayed through Charles Carter at Burton's request) | 11/19/19 | Raleigh, NC |
| West would give Taylor a written contract once he arrived in Wyoming | John Burton | 11/19/19 | Raleigh, NC |
| The opera performances were non-profit engagements performed for religious purposes | Kanye West on behalf of himself and the codefendants owned by him | 11/21/19-11/22/19 | Cody, WY |
| | Paul Johnson on behalf of West and West's companies, including on information and belief VGT and GOOD Music | 11/20/19-11/22/19 | Cody, WY |
| | Derek Watkins, on behalf of West and West's companies, including on information and belief VGT, GOOD Music, and Yeezy | 11/20/19-12/24/19 | Cody, WY; Burbank & Los Angeles, CA; NYC, NY |
| | Vanessa Beecroft, on behalf of West and West's companies, including on information and belief VGT and GOOD Music | 11/23/19 | Los Angeles, CA |
| | John Burton | 11/20/19 | Cody, WY |
| West would pay Taylor whatever price he | Paul Johnson | 11/20/19-11/22/19 | Cody, WY |

| False Statement | Who Made the False Statement | When | Where |
|---|---|---|---|
| invoiced; West's team was willing to pay top-dollar for top talent | Vanessa Beecroft | 11/20-11/23/19 | Cody, WY; Los Angeles, CA |
| | John Burton | 11/20/19-11/24/19 | Cody, WY; Los Angeles, CA |
| Taylor would receive substantial future work if he completed the opera project(s) | Kanye West | 11/22/19-11/23/19; 12/6/19 | Burbank & Los Angeles, CA |
| | Paul Johnson | 12/21/19; 11/25/19 | NYC, NY; Los Angeles, CA |
| | Derek Watkins | 12/14-16/19 | Burbank, CA |
| | Vanessa Beecroft | 11/20/19-12/24/19 | Cody, WY; Los Angeles/Burbank/Hollywood/Calabasas, CA; NYC, NY |
| Taylor would receive substantial future work if he invoiced at less than market rates | John Burton | 11/20/19 | Cody, WY |
| Taylor would receive a producer credit | Paul Johnson | 11/25/2019 | Los Angeles & Hollywood, CA |
| | Vanessa Beecroft | 11/23/2019 | Los Angeles, CA |
| | John Burton | 11/23/19-11/24/19 | Los Angeles, CA |

176. Defendants, through their identified agents, as well as the individuals themselves, knew these statements were false, or made the statements recklessly, without knowledge of their truth or falsity. They made the statements intending to deceive Taylor and to induce Taylor to forego other professional opportunities, to take on increased responsibilities for West's productions, to work in poor conditions, and to carry out this work prior to receiving any promised payment or credit.

177. Defendants achieved their goal. Buoyed by Defendants' bevy of false promises, on which he reasonably relied, Taylor developed, rehearsed, produced, and performed the opera productions, even in the absence of fair or reasonable compensation.

178. As a result of their false representations, Taylor suffered damages that include the lost engagements that he otherwise would have obtained and for which he would have been paid, the fair value of his services that he was not paid, the fair value of the use of his work product that Defendants were able to enjoy as a result of their fraud, and the fair value of public credit attributed to Taylor's work.

179. Taylor is entitled to recover the actual damages suffered by him, together with punitive damages.

## COUNT VII
## Unfair And Deceptive Trade Practice

180. Taylor incorporates and realleges the foregoing paragraphs of this Complaint.

181. The wrongful conduct of Defendants, described and set out above, was conducted in, and affected, commerce. That is, Defendants' wrongful activities with respect to Taylor were performed in the course and scope of their business activities. Their actions were an integral part of their commercial business activity and were designed to facilitate their offering of opera productions to the public that were intended to generate income and publicity that would ultimately result in increased profits and wealth for Defendants.

182. Defendants' wrongful actions affected not only commerce in general, but more specifically affected commerce in the State of North Carolina. By way of example, Taylor, a North Carolina resident who conducts his business from his address in Wake County,

suffered the complained-of injuries within the State of North Carolina, including loss of business income he was entitled to receive. Moreover, Defendants' complained-of misconduct, including their commercial exploitation of Taylor's work without compensation, took place in North Carolina, and Defendants received income from North Carolina for which they did not account to Taylor.

183. Defendants' promissory fraud, which induced Taylor's reasonable reliance on their representations and assurances and proximately caused damage to Taylor as described above, constitutes an unfair and deceptive trade practice for which Taylor is entitled to recover his damages and to have those damages trebled.

184. Defendants' repeated and shockingly insufficient compensation of Taylor for his services with respect to each of the four operas, depriving him of compensation he was entitled to receive, is an unfair and deceptive trade practice for which Taylor is entitled to recover his damages and to have those damages trebled.

185. Defendants' false imprisonment of Taylor and horrendous working conditions, which were designed to obtain Taylor's services without just compensation, are unfair and deceptive trade practices for which Taylor is entitled to recover his damages and to have those damages trebled.

186. Taylor suffered damages as a result of Defendants' unfair and deceptive acts, as more particularly described above.

187. Taylor is entitled to recover his damages and attorneys' fees pursuant to N.C. Gen. Stat. § 75-1.1 et seq., and is entitled to trebling of the damage award.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Chase Taylor prays for relief as follows:

1. A declaration that Taylor is a copyright owner and an author of the Taylor Works;

2. A declaration that Taylor, as an author of the Taylor Works, is entitled to a share of any profits earned from the use or licensing of the Taylor Works;

3. A damages award sufficient to compensate Taylor for his share of the profits associated with Defendants' use of the Taylor Works;

4. Injunctive relief requiring Defendants to provide an accounting to Taylor on an annual basis to determine any profits owed to Taylor for Defendants' ongoing use of the Taylor Works;

5. A damages award sufficient to compensate Taylor for the losses suffered from his reliance on Defendants' fraudulent statements and broken promises;

6. A damages award sufficient to compensate Taylor for the services rendered and benefits provided to Defendants;

7. A damages award sufficient to compensate Taylor for the injury sustained in connection with his false imprisonment;

8. A damages award sufficient to compensate Taylor for all the damages he suffered as a result of Defendants' multiple unfair and deceptive trade practices, trebled as provided by law;

9. An award to Taylor of pre- and post-judgment interest;

10. An award to Taylor for his costs and his attorneys' fees; and

11. Such other and further relief as the Court deems just and proper.

Respectfully submitted, this 11th day of November 2026.

/s/ Susan Freya Olive
Susan Freya Olive
N.C. State Bar No. 7252
/s/ Brian J. Crews
Brian J. Crews
N.C. State Bar No. 45964
**OLIVE & OLIVE, P.A.**
P.O. Box 2049
Durham, NC 27702
Telephone: (919) 683-5514
Facsimile: (919) 688-3781
emailboxednc@oliveandolive.com

/s/ Adam Adler
Adam Adler
*Pro Hac Vice - forthcoming*
**REICHMAN JORGENSEN LEHMAN & FELDBERG LLP**
1899 L Street, NW, Suite 410
Washington, DC 20036
Telephone: (650) 623-1480
aadler@reichmanjorgensen.com